**CLARKSON LAW FIRM, P.C.**
Yana Hart (SBN 306499)
*yhart@clarksonlawfirm.com*
Cassandra Rasmussen (*phv forthcoming*)
*crasmussen@clarksonlawfirm.com*
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TASHA AMARAL, individually and on behalf of all others similarly situated, | Case No. 3:26-cv-5474 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| CHATTEM INC. d/b/a Opella North America, and SANOFI-AVENTIS U.S. LLC | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

**TABLE OF CONTENTS**

**Page No.**

I.      INTRODUCTION ................................................................................................................1

II.     JURISDICTION ..................................................................................................................6

III.    VENUE ................................................................................................................................7

IV.     DIVISIONAL ASSIGNMENT............................................................................................7

V.      PARTIES .............................................................................................................................7

        A.      Plaintiff Tasha Amaral.............................................................................................7

        B.      Defendant Chattem, Inc. d/b/a Opella North America .............................................9

        C.      Defendant Sanofi-Aventis U.S. LLC .......................................................................9

VI.     FACTUAL ALLEGATIONS .............................................................................................10

        A.      Defendants Built a Marketing Campaign Around the False and Misleading "Non-Habit  Forming" Representation ................................................................................10

        B.      Reasonable Consumers Understand "Non-Habit Forming" to Mean No Risk of Habitual Use...........................................................................................................16

        C.      Defendants Knew that their "Non-Habit Forming" Representations were False ......17

        D.      The Unpurchased Products Are Substantially Similar to the Purchased Product......19

        E.      Lack of Adequate Remedy at Law.........................................................................19

VII.    CLASS ACTION ALLEGATIONS ...................................................................................20

VIII.   CAUSES OF ACTION ......................................................................................................23

IX.     PRAYER FOR RELIEF ....................................................................................................39

CLASS ACTION COMPLAINT

Plaintiff Tasha Amaral ("Plaintiff"), individually and on behalf of all others similarly situated, as more fully described herein (the "Class" and "Class Members"), brings this class action complaint against Defendants Chattem, Inc. ("Chattem"), and Sanofi-Aventis U.S. LLC ("Sanofi US") (together, "Defendants"), and alleges as follows:

## I.   INTRODUCTION

1.     Millions of Americans suffer without a good night's sleep. According to the CDC, more than one third of American adults are not getting enough sleep regularly.[1] Insufficient sleep is a prominent and pervasive problem in today's society and is linked to depression, ADHD, obesity, Type 2 diabetes, cardiovascular disease, cancer, and Alzheimer's.[2] Thus, consumers turn to over-the-counter products in search of sleep, which has become a "cultural obsession—fueling the rise of an entire industry."[3]

2.     Over the counter products promoting nighttime use are not used sporadically; they are taken routinely, habitually, night after night, often in stretches that blur together – a pattern well

---

[1] *1 in 3 Adults Don't Get Enough Sleep,* CDC, https://archive.cdc.gov/#/details?url=https://www.cdc.gov/media/releases/2016/p0215-enough-sleep.html  (last visited June 1, 2026); *See also Sleeping Aids Market Share, Size, Trends, Industry Analysis Report, By Product (Mattresses & Pillows, Sleep Laboratories, Medications, Sleep Apnea Devices); By Sleep Disorders; By Region; Segment Forecast, 2026–2034*, POLARIS MARKET RESEARCH (June 2022), https://www.polarismarketresearch.com/industry-analysis/sleeping-aids-market (last visited June 1, 2026) (noting that 12% of Americans suffer from chronic insomnia, and often turn to sleep-aid products).

[2] *See* Kristen L. Knutson, et. al, *Role of Sleep Duration and Quality in the Risk and Severity of Type 2 Diabetes Mellitus*, 116 Arch Intern Med 1768 (Sept. 18, 2006), https://pubmed.ncbi.nlm.nih.gov/16983057/ (last visited June 1, 2026) (linking sleep loss to increased diabetes risk); Patrick H. Finan, et. al, *The Effects of Sleep Continuity Disruption on Positive Mood and Sleep Architecture in Healthy Adults*, 38 Sleep 1735 (2015), https://gwern.net/doc/zeo/2015-finan.pdf (last visited June 1, 2026) (sleep deprivation and disruption can lead to a decrease in positive mood); Vijay K. Chattu, et. al. *The Global Problem of Insufficient Sleep and Its Serious Public Health Implications*, 7 Healthcare 1, 9-10 (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6473877/ (last visited June 1, 2026) ("[g]ood sleep is necessary for good physical and mental health and a good quality of life"); *Sleep and Chronic Disease*, Centers for Disease Control and Prevention (June 2023), https://www.cdc.gov/pcd/collections/pdf/Sleep_Deprivation_collection_508.pdf (last visited June 2, 2026) (linking the risk of diabetes, cardiovascular disease, obesity, and depression to insufficient sleep); Neil Howe, *America The Sleep-Deprived*, Forbes (Aug. 18, 2017), https://www.forbes.com/sites/neilhowe/2017/08/18/america-the-sleep-deprived/?sh=684e9c611a38 (last visited June 1, 2026).

[3] *See* Howe, *supra* note 2.

1

CLASS ACTION COMPLAINT

understood by the companies that market them. According to Gallup, a long-established research and analytics firm which has tracked public health and behavioral trends for decades, roughly 41% of U.S. adults who are using an over-the-counter ("OTC") aid used the drugs for a year or longer.[4] Extrapolated to the greater U.S. population, these numbers indicate that nearly 10 million consumers habitually use sleep-aid Products.[5] In a more recent study of 2,006 adults in the United States conducted in 2021 by the American Academy of Sleep Medicine ("AASM"), 51% reported using a sleep aid, and 53% reported that they used the aid "often" to fall asleep, with only 5% reporting that they relied on a sleep aid "rarely."[6] Therefore, the sleep aid market has become a global juggernaut, reaping nearly $65 billion a year, which is only continuing to rise.[7] Notably, North America accounts for the highest purported market share.[8] A 2015 Consumer Reports survey of 4,023 adults found that 20 percent of participants reported use of OTC medication in the last year to improve sleep.[9] Of those, almost 18 percent reported that they took OTC sleep-aids daily.[10]

3.      Because of the prevalent use of sleep-aids, consumers desire products that are safe and do not cause significant side effects.[11] They specifically look for sleep-aid products that cannot and do not cause habitual use,[12] turning to natural alternatives and products that are advertised as non-habit forming.[13]

---

[4] *Id.*
[5] *Id.*
[6] *AASM Sleep Prioritization Survey: Sleep Aid Use*, AMERICAN ACADEMY OF SLEEP MEDICINE (2021), https://aasm.org/wp-content/uploads/2021/04/sleep-prioritization-survey-2021-sleep-aid-use.pdf (last visited June 1, 2026).
[7] *See supra* note 1, *Sleeping Aids Market Share, Size, Trends, Industry Analysis Report.*
[8] *Id.* ("The high prevalence of sleep disorders contributes to the regional market dominance.").
[9] Ginger Skinner, *Can You Get Hooked on Over-the-Counter Sleep Aids?*, CONSUMER REPORTS (Dec. 29, 2016), https://www.consumerreports.org/drugs/over-the-counter-sleep-aids-can-you-get-hooked/ (last visited June 1, 2026).
[10] *Id.*
[11] Eric Suni, et. al, *Sleep Aids*, SLEEP AIDS: KNOW THE TYPES, BENEFITS, & RISKS (July 9, 2025), https://www.sleepfoundation.org/sleep-aids (last visited June 1, 2026).
[12] Eric Suni, et. al, *Natural Sleep Aids*, SLEEP AIDS (July 15, 2025), https://www.sleepfoundation.org/sleep-aids/natural-sleep-aids#:~:text=Many%20customers%20prefer%20natural%20sleep%20supplements%20because%20they,about%20the%20addictive%20potential%20of%20prescription%20sleep%20aids (last visited June 1, 2026).
[13] *See generally id.; see also Functional Ingredients in Sleep Supplements: Global Market Overview*, INNOVA MARKET INSIGHTS (Sept. 17, 2025), https://www.innovamarketinsights.com/trends/functional-ingredients-in-sleep-supplements/ (last visited June 1, 2026).

CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

4.    To capitalize on consumers' demand for non-habit forming sleep aids, and in an effort to increase profits, Defendants prominently marketed their Unisom® brand Over-The-Counter Sleep Aid Products that contain Diphenhydramine (the "Products") as "Non-Habit Forming" (hereinafter, "Habit Representation" and/or "Challenged Representation"), deliberately leading reasonable consumers, including Plaintiff, to incorrectly believe that the Products do not and cannot cause habitual use. *See infra*, ¶ 5 (Product List). Fair and accurate depictions of examples of the Products' front-facing labels and packaging are included below, featuring the Challenged Representation.[14]



---

[14] *Unisom SleepGels Softgels, 32 CT*, CVS PHARMACY, https://www.cvs.com/shop/unisom-sleepgels-softgels-32-ct-prodid-1650017 (last visited June 1, 2026); *Unisom PM Pain Nighttime Sleep Aid + Pain Reliever, 30 CT,* WALMART, https://www.walmart.com/ip/2-pack-Unisom-PM-Pain-Nighttime-Sleep-aid-Pain-Reliever-Acetaminophen-Diphenhydramine-HCI-30-Caplets/13371964871 (last visited June 1, 2026); *Unisom SleepMinis Mini-Capsules Nighttime Sleep-Aid*, *60 CT*, WALMART, https://www.walmart.com/ip/Unisom-SleepMinis-Mini-Capsules-Nighttime-Sleep-Aid-60-Count/46120225 (last visited June 1, 2026).

CLASS ACTION COMPLAINT





CLASS ACTION COMPLAINT

5.    The "Non-Habit Forming" representation is prominently displayed at the top front of every Product label, designed to capture consumers' attention. It is there to reassure the public that this accessible over-the-counter medication to combat sleeplessness will not come with the risks associated with dependence. But the Products contain diphenhydramine HCI, a sedating antihistamine known to lead to dependence, chronic consumption of which can lead to abuse, withdrawal, agitation, tremors, neurologic symptoms, and mental status changes – including psychosis.[15]

6.    Given the known pharmacological profile of diphenhydramine and its intended use as a routine nighttime sleep aid – naturally taken repeatedly over consecutive nights – Defendants knew that consumers would use the Products in sustained patterns that increase the risk of dependence and/or abuse. Yet, the Products' front label offered a categorical reassurance that the Products are "non-habit forming," without caveat, creating a misleading impression of the Products' effects which does not reflect the reality of its repeated use.

7.    Consumers are not medical specialists who can reasonably be expected to evaluate the clinical significance of ingredients listed on the product label, nor should they be required to do so. They also cannot reasonably determine whether other ingredients in the Products mitigate or offset any habit-forming properties of other ingredients, and lack the specialized knowledge required to assess pharmacological interactions. When faced with a prominent, front-facing representation such as "Non-Habit Forming," reasonable consumers are entitled to rely on that representation instead of second-guessing it and researching medical literature. Consumers purchase over-the-counter sleep aids in ordinary retail settings – walking down the aisle, scanning labels, placing products in carts. They do not undergo the same deliberative process akin to purchasing a house or even a car. It is a routine transaction, shaped by the information presented at a glance.

8.    As a result of Defendants' deceptive advertising and marketing practices, consumers,

---

[15] Saran J., Barbano, R., *Chronic diphenhydramine abuse and withdrawal,* 7 NEUROL. CLIN. PRACT. 439 (Oct. 2017), https://pmc.ncbi.nlm.nih.gov/articles/PMC5874453/; Kate Warren, *Acute Delirium Associated with Diphenhydramine Withdrawal in a Patient with Complex Medical Conditions*, 20 AM. J. PSYCHIATRY RESIDENTS' J. 12 (June 4, 2025), https://pmc.ncbi.nlm.nih.gov/articles/PMC5874453/.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

including Plaintiff, are paying a premium for "non-habit-forming" sleep aid products that, in fact, induce habitual use.

9.    Through falsely, misleadingly, and deceptively labeling, packaging, and advertising the Products with the Challenged Representation, Defendants sought to take advantage of consumers' desire, perceived value, and willingness to pay more for safer sleep-aids that do not pose a risk of forming a habit. In this way, Defendants have charged consumers a premium for habit-forming products falsely advertised and warranted as "***Non-Habit Forming***," while reaping the financial benefits. Defendants have done so at the expense of unwitting consumers as well as Defendants' lawfully acting competitors who, given the science demonstrating a risk of habit formation, do not falsely label products with active ingredient diphenhydramine as "non habit forming," thus giving Defendants an unfair competitive advantage. Accordingly, Defendants' Habit Representation is misleading and deceptive, and therefore unlawful.

10.    The products at issue are the Unisom® brand Over-The-Counter Sleep Aid products, which are labeled with the Challenged Representation, contain the active ingredient diphenhydramine, and are sold to consumers in the United States, regardless of the Products' form, size, or variations—such as pill count, multi or single pack, flavors, or additional features (collectively referred to herein and throughout this complaint as the "Products"). The Products include, but are not necessarily limited to, the following product lines:

a)  Unisom® SleepGels;

b)  Unisom® SleepMinis;

c)  Unisom® PM Pain.

11.    Plaintiff brings this action to recover the price premium that consumers overpaid for Products that do not comport with the "Non-Habit Forming" representation, and to obtain injunctive relief requiring Defendants to cease manufacturing, marketing, and selling the Products with the false and misleading Challenged Representation.

## II.    JURISDICTION

12.    This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more

members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

13. This Court has personal jurisdiction over Defendants because Defendants purposefully availed themselves of this forum by conducting substantial business within California such that Defendants have significant, continuous, and pervasive contacts with the State of California.

### III.    VENUE

14. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District. Specifically, Plaintiff purchased the unlawful Products in this District, and Defendants have deliberately marketed, advertised, and sold the Products within this District using the Challenged Representation.

### IV.    DIVISIONAL ASSIGNMENT

15. A substantial part of the events or omissions giving rise to the claims in this action occurred San Francisco County, California—where Plaintiff resides and purchased the Product at issue. *See infra* at ¶¶ 11. Accordingly, assignment to the San Francisco Division is proper pursuant to Civil L.R. 3-2(c) and Civil L.R. 3-2(d).

### V.    PARTIES

#### A.  Plaintiff Tasha Amaral

16. Plaintiff Tasha Amaral is, and at all relevant times hereto was, an individual residing in the state of California.

17. On or around April 1, 2025, Plaintiff purchased the Unisom SleepGels (60 count) (the "Purchased Product") for approximately $12.48 from Amazon.com while located in San Francisco, California.

18. In making the purchase, Plaintiff read the Challenged Representation on the Product's label or packaging, leading Plaintiff to believe that the Product does not, and cannot, cause habitual use—i.e., does not pose a risk of frequent use over prolonged periods.

7

CLASS ACTION COMPLAINT

19.    At the time of purchase, Plaintiff did not know that the Challenged Representation was false—i.e., that the Product can or does cause habitual use.

20.    Plaintiff did not notice any disclaimer, qualifier, or other explanatory statement or information on the Product's labels or packaging that contradicted the prominent Challenged Representation or otherwise suggested that the Products would or may cause habitual use.

21.    Plaintiff would not have purchased the Product or would not have paid as much for the Product, had Plaintiff known that the Challenged Representation was false—i.e., that the Products can or do cause habitual use.

22.    Plaintiff continues to see the Products available for purchase and desires to purchase them again if the Challenged Representation was in fact true.

23.    Plaintiff does not personally know whether the Products or diphenhydramine can lead to frequent use over prolonged periods, or the psychological impacts of sleep aides and whether they can or cannot lead users to habitually use them. Plaintiff does not possess any specialized knowledge, skill, experience, or education in sleep-aid products, similar to and including the active or inactive ingredients used in the Products at issue. Plaintiff also does not know and cannot reasonably determine whether other ingredients in the Products mitigate or offset any habit-forming properties, and lacks the specialized knowledge required to assess pharmacological interactions of those ingredients. Plaintiff also is not aware of whether Defendants have changed their ingredients or formula to ensure that the Products become consistent with the representation on the label. As a result, Plaintiff had and still has no way of determining whether the Challenged Representation on the Products were and are true.

24.    Plaintiff is, and continues to be, unable to rely on the truth of the Challenged Representation on the Products' labels.

25.    Defendants continue to advertise, market, and sell the Products with the Challenged Representation. Plaintiff would like to purchase the Products in the future if they lived up to and conformed with the Challenged Representation. However, Plaintiff is an average consumer who is not sophisticated in the chemistry, medicine, manufacturing, formulation, and psychological impacts of sleep-aid products. Indeed, Plaintiff does not have any personal knowledge regarding

8
CLASS ACTION COMPLAINT

active ingredients and the formulations of the Products. Thus, Plaintiff cannot accurately differentiate between active ingredients in sleep-aid products that pose a risk of habitual use and those which do not and cannot. Since Plaintiff desires to purchase the Products again to obtain the benefits of the Challenged Representation—despite the fact that the Products were once marred by false advertising or warranties—Plaintiff would likely and reasonably, but incorrectly, assume the Products are true to and conform with the Challenged Representation on their labels, packaging, and Defendants' advertisements, including Defendants' website and social media platforms. Accordingly, Plaintiff is at risk of reasonably, but incorrectly, assuming that Defendants have fixed the Products such that Plaintiff may buy them again, believing they are no longer falsely advertised and warranted, and instead believing that they comply with the Challenged Representation. In this regard, Plaintiff is currently and in the future deprived of the ability to rely on the Challenged Representation to purchase the Products.

### B. Defendant Chattem, Inc. d/b/a Opella North America

26.    Defendant Chattem, Inc., doing business as Opella North America ("Chattem"), is a Tennessee corporation with its principal place of business at 1715 West 38th Street, Chattanooga, Tennessee 37409.

27.    At all times relevant to this action, Chattem has manufactured, marketed, distributed, and sold the Class Products, identified as the manufacturer on Class Product packaging, and is the entity listed on the Unisom website's contact page for consumer inquiries.

28.    At all times relevant to this action, Chattem was responsible for the design, creation, and dissemination of the Challenged Representations, and for the failure to disclose the material information identified in the Challenged Omissions, alleged herein.

### C. Defendant Sanofi-Aventis U.S. LLC

29.    Defendant Sanofi-Aventis U.S. LLC ("Sanofi US") is a Delaware limited liability company with its principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807.

30.    On information and belief, Sanofi US has at all relevant times jointly with Chattem manufactured, distributed, marketed, advertised, labeled, and sold the Class Products throughout the United States.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

31. On information and belief, at all times relevant to this action, Sanofi US (along with Chattem) was responsible for the design, creation, and dissemination of the Challenged Representations, and for the failure to disclose the material information identified in the Challenged Omissions, alleged herein.

## VI. FACTUAL ALLEGATIONS

### A. Defendants Built a Marketing Campaign Around the False and Misleading "Non-Habit Forming" Representation

32. Defendants deliberately created and executed a marketing campaign to distinguish the Unisom® brand products from their competitors, as a brand and company that manufactures sleep-aid products that are "Non-Habit Forming." Not only do Defendants label the Products' packaging with the Challenged Representation ("Non-Habit Forming") but Defendants have also heavily advertised their Products as being "non-habit-forming." Defendants maintain a Unisom® website, and several Unisom® social media accounts—all designed to promote the brand, as well as market the Products, in line with Defendants' brand strategy, as "non-habit-forming" to convince consumers that Defendants' Unisom® brand Products, at issue here, will not result in habitual use. These representations are false.

33. A 2008 study by Gianluigi Tanda, *et al*., titled "Cocaine-Like Neurochemical Effects of Antihistaminic Medications," revealed that diphenhydramine has habit-forming properties.[16] The study compared different classes of drugs abused by humans, including psychostimulants (e.g., cocaine or amphetamine) and other abused drugs (e.g., opioids, nicotine, or cannabinoids), to diphenhydramine, and found a similar pattern of greater activation of dopamine transmission. Moreover, the study provides a strong neurobiological basis underlying the cocaine-like behavioral effects observed with these compounds like diphenhydramine, and the occasional misuse of over-the-counter antihistamine medications. Diphenhydramine increased dopamine transmission most similarly among the antihistamines tested, meaning it had the highest similarity to the pattern of activation to psychostimulants like cocaine.

---

[16] Gianluigi Tanda, et al., *Cocaine-Like Neurochemical Effects of Antihistaminic Medications,* 106 J. NEUROCHEM 147 (July 1, 2008), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6741778/.

CLASS ACTION COMPLAINT

34.    Because mice and rats are biologically similar to humans, they provide "excellent" animal models for studying human physiology.  Mice and rats share 95 percent of their genes with humans, have similar immune systems, and obtain similar diseases for many of the same genetic reasons.  Rats are also similar to humans in how their brains interpret rewards and in habit formation.  Because of this, mice and rats serve as primary model systems for studying human pathophysiology in clinical settings.

35.    Consistent with the science demonstrating that diphenhydramine is habit forming, other sleep aids containing this same active ingredient, which are sold by Defendants' competitors, do not feature the misleading "Non-Habit Forming" label. For example, CVS's "Nighttime Sleep Aid" contains front-label claims such as "Fall asleep fast" and "easy to swallow."[17] Walgreens' "Nighttime Sleep Aid" includes front-label claims including "Maximum Strength," "Nighttime," and "Fall asleep fast."[18] Both of these products contain the same active ingredient as the Products but neither has labels that claim that they are "Non-Habit Forming."

36.    By falsely labeling their product as "Non-Habit Forming," Defendants exploit vulnerable consumers who seek relief from sleep difficulties, giving them a false sense of safety and security based on its "non-habit forming" representation. This deceptive labeling not only takes advantage of these consumers but also provides Defendants with an unfair competitive advantage over other companies which offer similar products with the same active ingredient but which refrain from making such misleading claims.

37.    Defendants falsely and misleadingly label the Products with the Challenged Representation: "Non-Habit Forming" as depicted below.

Non-Habit Forming

---

[17] CVS Nighttime Sleep Aid Tablets, 48-ct, CVS PHARMACY, https://www.cvs.com/shop/cvs-nighttime-sleep-aid-tablets-prodid-1012018 (last visited June 1, 2026).
[18]    Walgreens    Nighttime    Sleep    Aid    Softgels,    32-ct,    WALGREENS, https://www.walgreens.com/store/c/walgreens-nighttime-sleep-aid-softgels/ID=prod3239480-product (last visited June 1, 2026).

11
CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

38. The Challenged Representation on the Products' packaging is conspicuous and designed to grab the consumer's attention.

    a. **Placement.** The Challenged Representation is prominently placed on the top right of the front display panel of each Products' front label or packaging.

    b. **Sparsity.** The Challenged Representation is not hidden in a sea of information; rather, the front display panel contains scant information about the Products, largely limited to the brand name (Unisom®), identity of the product line (e.g., Nighttime Sleep-Aid a) and size or count (e.g., 100 SoftGels).

    c. **Typeface.** The Challenged Representation stands out from the scant information contained on the front panel, prominently displayed with a bold and large typeface, clear and legible font, and highly visible letters that starkly contrast with the Products' background.

39. In this way, Defendants use the carefully designed labels and packaging, including the Challenged Representation's placement, repetition, and typeface, alongside the sparsity of competing information, to perpetuate the false notion that the Products are "non-habit-forming." The net-effect or net-impression of consumers viewing the Products' labels or packaging is that the Products are "non-habit-forming."

40. Although each of the Products at issue is marketed with the Challenged Representation, the Products, specifically diphenhydramine (an ingredient used in the Products), can cause habitual use. Habitual use of the Products containing diphenhydramine creates a risk of misuse.

41. The American Psychological Association ("APA") defines habit as "well-learned behavior or automatic sequence of behaviors that is relatively situation specific and over time has become motorically reflexive and independent of motivational or cognitive influence---that is, it is performed with little or no conscious intent."[19] Habits formed through repetition of behavior in specific contexts are automatically triggered as a response to contextual clues that have been

---

[19] APA Dictionary of Psychology "Habit", AM. PSYCH. ASS'N, https://dictionary.apa.org/habit (last visited June 1, 2026).

12

CLASS ACTION COMPLAINT

associated with their performance and are formed through a psychological pattern commonly known as a "habit loop."[20]

42.    The APA defines habit-formation as "the process by which, through repetition or conditioning, animals or humans acquire a behavior that becomes regular and increasingly easy to perform."[21]

43.    Drug Habituation (e.g., habit of using a substance) results from the repeated consumption of a drug. The characteristics of this include: a desire (but not a compulsion) to continue using a drug or substance for the sense of improved well-being and a degree of psychic dependence on the effect of the drug or substance (but absence of physical dependence).[22]

44.    Most people have a bedtime routine to assist with regular and quality sleep patterns. Data from the CDC shows that more than 8 percent of adults take a sleep aid more than four times a week as a part of their bedtime routine to help fall or stay asleep.[23] Decades of psychological research demonstrate that repetition of a simple action (such as taking a sleep aid like the Product) in a consistent context (before going to bed) leads to the action being activated upon subsequent exposure to those external cues (that is, habitually). This is the case, and such habit is likely to persist, even after conscious attention, motivation, or interest is reduced or dissipates.[24]

---

[20] *Habit Formation*, PSYCHOLOGY TODAY, https://www.psychologytoday.com/us/basics/habit-formation (last visited June 1, 2026); *see also* Phillipa Lally, Cornelia H. M. Van Jaarsveld, Henry W. W. Potts, & Jane Wardle, *How are habits formed: Modelling habit formation in the real world*, EUROPEAN J. OF SOCIAL PSYCH., 40, 998–1009 (July 16, 2009), https://sci-hub.ru/10.1002/ejsp.674 (last visited June 1, 2026).

[21] APA Dictionary of Psychology "Habit Formation", AM. PSYCH. ASS'N, https://dictionary.apa.org/habit-formation (last visited June 1, 2026).

[22] *Expert Committee on Addiction-Producing Drugs (Seventh Report)*, World Health Organization, No. 116 (1957), https://apps.who.int/iris/bitstream/handle/10665/40371/WHO_TRS_116.pdf?sequence=1 (last visited June 1, 2026).

[23] Cynthia Reuben, *Morbidity and Mortality Weekly Report: QuickStats: Percentage of adults aged ≥18 years who took medication to help fall or stay asleep four or more times in the past week, by sex and age group — National Health Interview Survey, United States, 2017–2018*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Dec. 13, 2019), https://www.cdc.gov/mmwr/volumes/68/wr/mm6849a5.htm (last visited June 1, 2026).

[24] Benjamin Gardner, et al., *Making health habitual: the psychology of 'habit-formation' and general practice.* 62 BRITISH JOURNAL OF GENERAL PRACTICE 664, 664 (Dec. 2012), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3505409/ (last visited Jan. 27, 2023); *see also* Peter

CLASS ACTION COMPLAINT

45.    Habit is not the same as addiction. A habit does not require any drug blunting effect or physical dependence to form like an addiction requires (i.e., increase in user's physical tolerance to the drug whereby more of the drug is needed to create the same effect). "Habits . . . are like a lesser form of addiction: [t]he more you engage in the past, the more likely you are to engage today."[25] Habitual behavior in relation to drug-taking habits is characterized as "behavior that has become automatized, highly stimulus bound, inflexible, and insensitive to the associated outcomes (positive or negative)."[26] The role of habituation is an "important contribution . . . to our understanding of chronic relapsing drug use."[27]

46.    Diphenhydramine is the active ingredient in all the Products. Diphenhydramine users are at risk of habitually using the Products,[28] as daily use and overuse is common.[29] Specifically, the Products are used in a situation-specific context, where consumers incorporate them into a bedtime routine that becomes more motorically reflexive and less dependent on motivational or cognitive influence. Indeed, consumers' repeated use of the Products is likely to occur without their conscious awareness as the "non-habit forming" representation lulls them into a false sense of safety. Medication that provides a feeling of relaxation, sedation, wellbeing, or euphoria is more likely to be habit-forming.

47.    The habitual use of diphenhydramine creates a risk of misusing products containing

J. Bayley, et al., *Robust habit learning in the absence of awareness and independent of the medial temporal lobe.* 436 NATURE 550, 550 (May 4, 2006) available at https://ncbi.nlm.nih.gov/pmc/articles/PMC1457096/ (last visited Jan. 27, 2023).

[25] Carmen Nobel, *How to Get People Addicted to a Good Habit*, Forbes (Jan. 27, 2018), https://www.forbes.com/sites/hbsworkingknowledge/2018/01/27/how-to-get-people-addicted-to-a-good-habit (last visited June 1, 2026).

[26] Zsuzsika Sjoerds, et al., *The role of habits and motivation in human drug addiction: a reflection*, 5 Front Psychiatry 1, 1 (Jan. 29, 2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3905212/pdf/fpsyt-05-00008.pdf (last visited June 1, 2026).

[27] *Id*. at 2.

[28] Skinner, *supra* note 10.

[29] Antonia Nemanich, et al., *Increased rates of diphenhydramine overdose, abuse, and misuse in the United States, 2005–2016*, 59 Clinical Toxicology 1 (Mar. 10, 2021), https://www.tandfonline.com/doi/full/10.1080/15563650.2021.1892716 (last visited June 1, 2026).

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

14

CLASS ACTION COMPLAINT

the ingredient.[30]

48.     The sedative effects of diphenhydramine, combined with its ability to include feelings of relaxation and well-being, make it prone to habitual use even without physical addiction. Clinical research has shown that tolerance to the sedative effects of diphenhydramine can develop within days – as little as only four days, reducing its effectiveness with repeated use.[31]

49.     Consumers are not expected to have the knowledge that the medication may become less effective or habit forming with prolong use, and may reasonably believe that they can use a sleep aid, labeled "non-habit forming" daily, without risk of tolerance or dependence.

50.     The high potential for misuse stems from the development of a tolerance to diphenhydramine and an onslaught of withdrawal symptoms that worsen with prolonged use.[32] Diphenhydramine blocks the action of acetylcholine, a neurotransmitter involved in various bodily functions.[33] The drug inhibits the reuptake of serotonin, another neurotransmitter affecting mood regulation, contributing to misuse as individuals seek the familiar pattern of its sedating and hallucinogenic effects.[34] Frequent use of diphenhydramine leads to developing a tolerance to the drug that makes it difficult to stop without facing withdrawal symptoms.[35] Cases documenting the

[30]Jagroop S. Saran, et al., *Chronic diphenhydramine abuse and withdrawal*, 7 Neurology: Clinical Practice 439 (Oct. 2017), https://www.neurology.org/doi/10.1212/CPJ.0000000000000304 (last visited June 1, 2026); David F. Craig & Clive S. Mellor, *Dimenhydrinate dependence and withdrawal*, 142 Can. Med. Assoc. J. 970, 970 (May 1, 1990), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1451752/pdf/cmaj00214-0060.pdf (last visited June 1, 2026); Fabrizio Schifano, et al., *Focus on Over-the-Counter Drugs' Misuse: A Systematic Review on Antihistamines, Cough Medicines, and Decongestants*, 12 Frontiers in Psychiatry 1, 9 (May 7, 2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8138162/ (last visited June 1, 2026).

[31] GS Richardson, et al., *Tolerance to Daytime Sedative Effects of H1 Antihistamines 22,* J. of Clin. Pharm. 511-515 (Oct. 2022); Chen TY, et al., Diphenhydramine dependence through deep intramuscular injection resulting in myonecrosis and prolonged QT c interval, 39 J. Clin. Pharm. Therapeutics 325-327 (2014).

[32] Saran, *supra* note 36, at 440.

[33] Antonia Nemanich, et al., *Increased rates of diphenhydramine overdose, abuse, and misuse in the United States, 2005–2016*, 59 Clinical Toxicology 1002 (Mar. 10, 2021), https://www.tandfonline.com/doi/full/10.1080/15563650.2021.1892716 (last visited June 1, 2026).

[34] *Id.*

[35] Paula K. Schweitzer, et al., *Sleepiness and performance during three-day administration of cetirizine or diphenhydramine*, 94 J. Allergy Clinical Immunology 716, 722 (Oct. 1994), https://pubmed.ncbi.nlm.nih.gov/7930305/ (last visited June 1, 2026).

CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

severe effects of diphenhydramine dependence illustrate the risk undertaken by consumers who purchase a product containing the ingredient.[36] From 2005 to 2016, there was a reported 63 percent increase in intentional exposure to diphenhydramine.[37] The decade-long study found that adults over 55 had a 230% increase in rates of diphenhydramine misuse.[38] The pharmacological properties of diphenhydramine commonly induce habitual misuse and dependence. The Products' non-habit-forming representations falsely suggesting that consumers are not at risk further exacerbate the alarming probability of dependency associated with the use of Defendants' Products.

**B. Reasonable Consumers Understand "Non-Habit Forming" to Mean No Risk of Habitual Use**

51.    The Challenged Representation, in isolation or combined with Defendants' pervasive marketing campaign and brand strategy, lead reasonable consumers, like Plaintiff, into believing the Products conform to the Challenged Representation. More specifically, reasonable consumers interpret the Challenged Representation to mean that the Products are "non-habit-forming"—meaning that the Products do not and cannot cause habitual use—i.e., do not pose a risk of frequent routine use over prolonged periods. This interpretation is not only consistent with the APA's definition and medical understanding of "habit," as described above, but it is also consistent with the ordinary and common usage of the term "habit" defined by various dictionaries, as follows:

a.  Cambridge Dictionary: "something that you do often and regularly, sometimes without knowing that you are doing it"; "a particular act or way of acting that you tend to do regularly"[39]

[36] Anne Roussin, et al., *Misuse and Dependence on Non-Prescription Codeine Analgesics or Sedative H1 Antihistamines by Adults: A Cross-Sectional Investigation in France*, 8 PLOS ONE 1, 1 (Oct. 3, 2013), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0076499 (last visited June 1, 2026); Caroline Bonham & Florian Birkmayer, *Severe Diphenhydramine Dependence and Withdrawal: Case Report*, 5 J. Dual Diagnosis 97, 101—102 (Jan. 20, 2009), https://www.tandfonline.com/doi/abs/10.1080/15504260802620269 (last visited June 1, 2026).
[37] Antonia Nemanich, Erica Liebelt, & Amber K. Sabbatini, *Increased Rates of Diphenhydramine Overdose, Abuse, and Misuse in the United States, 2005–2016.* 59 Clinical Toxicology 1002, 1004 (Feb. 2021) https://docslib.org/doc/12853967/increased-rates-of-diphenhydramine-overdose-abuse-and-misuse-in-the-united-states-2005-2016 (last visited June 1, 2026).
[38] *Id*. at 1005.
[39] Cambridge Dictionary, *Habit*, https://dictionary.cambridge.org/dictionary/english/habit (last visited June 1, 2026).

16

CLASS ACTION COMPLAINT

b.  Merriam-Webster: "a settled tendency or usual manner of behavior"; "an acquired mode of behavior that has become nearly or completely involuntary"; "a behavior pattern acquired by frequent repetition or physiologic exposure that shows itself in regularity or increased facility of performance"[40]

c.  Collins Dictionary: "A habit is something that you do often or regularly"; "a thing done often and hence, usually, done easily; practice; custom"; "a pattern of action that is acquired and has become so automatic that it is difficult to break"; "a tendency to perform a certain action or behave in a certain way; usual way of doing"; "an acquired behavior pattern regularly followed until it has become almost involuntary"; "customary practice or use"; "a particular practice, custom, or usage"; "a dominant or regular disposition or tendency"[41]

d.  Dictionary.com: "an acquired behavior pattern regularly followed until it has become almost involuntary"; "customary practice or use"; "a tendency or disposition to act in a particular way"; "established custom, usual practice, etc."[42]

e.  Oxford Learners Dictionary: "a thing that you do often and almost without thinking, especially something that is hard to stop doing"; "usual behaviour"[43]

**C.  Defendants Knew that their "Non-Habit Forming" Representations were False**

52.  Defendants knew that the Challenged Representation was false, misleading, deceptive, and unlawful at the time that Defendants manufactured, marketed, advertised, labeled, and sold the Products using the Challenged Representation to Plaintiff and the Class. Defendants intentionally and deliberately used the Challenged Representation, alongside its marketing campaign and brand strategy, to cause Plaintiff and similarly situated consumers to buy the Products with the belief that the Challenged Representation is true.

53.  Defendants named and marketed the Products with the Challenged Representation but

---

[40] Merriam-Webster Dictionary, *Habit*, https://www.merriam-webster.com/dictionary/habit (last visited June 1, 2026).
[41] Collins Dictionary, *Habit*, https://www.collinsdictionary.com/dictionary/english/habit (last visited June 1, 2026).
[42] Dictionary.com, *Habit*, https://www.dictionary.com/browse/habit (last visited June 1, 2026).
[43] Oxford Learners Dictionary, *Habit*, https://www.oxfordlearnersdictionaries.com/definition/english/habit (last visited June 1, 2026).

17

CLASS ACTION COMPLAINT

opted to formulate and manufacture them in a manner that does not conform to the representation. Specifically, Defendants named and advertised the Products as "Non-Habit Forming" sleep-aids. However, the Products pose a risk of causing habitual use because they contain diphenhydramine.

54. Defendants knew, or should have known, that the Challenged Representation would lead reasonable consumers into believing that the Products would not result in habitual use. Defendants labeled and packaged each of the Products with the Challenged Representation and utilized a long-standing brand strategy to identify the Products as "non-habit-forming." Defendants have an obligation under section 5 of the Federal Trade Commission Act, codified as 15 U.S.C. § 45, to evaluate their marketing claims from the perspective of a reasonable consumer. That means Defendants are statutorily obligated to consider whether the Challenged Representation, be it in isolation or conjunction with its marketing campaign, would mislead reasonable consumers into believing that the Products are "non-habit-forming." Thus, Defendants either knew the Challenged Representation was misleading before it marketed the Products to the Class, including Plaintiff, or Defendants would have known it was deceptive had they complied with their statutory obligations.

55. Defendants also knew that the Challenged Representation was material to consumers when making their purchasing decisions. First, manufacturers and marketers, like Defendants, generally reserve the front primary display panel of labels of packaging on consumer products for the most important and persuasive information, which they believe will motivate consumers to buy the products. Here, the conspicuousness of the Challenged Representation on the Products' labels and packaging demonstrates Defendants' awareness of its importance to consumers and Defendants' understanding that consumers prefer and are motivated to buy products that conform to the Challenged Representation. Second, manufacturers and marketers repeat marketing claims to emphasize and characterize a brand or product line, shaping the consumers' expectations, because they believe those repeated messages will drive consumers to buy the Product. Here, the constant, unwavering use of the Challenged Representation on the Products, advertisements, and throughout Defendants' marketing campaign, evidence Defendants' awareness that the falsely advertised Product-attribute is important to consumers. It also evidences Defendants' intent to convince consumers that the Products conform to the Challenged Representation and, ultimately, drive sales.

18

CLASS ACTION COMPLAINT

56.    Defendants, as the manufacturer and marketer of the Products, had exclusive control over the Challenged Representation's inclusion on the Products' labels, packaging, and advertisements—i.e., Defendants readily and easily could have stopped using the Challenged Representation to sell the Products if they had chosen to do so. However, despite Defendants' knowledge of the Challenged Representation's falsity, and Defendants' knowledge that consumers reasonably rely on the Challenged Representation in deciding to buy the Products, Defendants deliberately chose to market the Products with the Challenged Representation, thereby misleading consumers into buying or overpaying for the Products. Thus, Defendants knew, or should have known at all relevant times that the Challenged Representation misleads reasonable consumers, such as Plaintiff, into buying the Products to attain the product-attributes that Defendants falsely advertised and warranted.

**D.    The Unpurchased Products Are Substantially Similar to the Purchased Product**

57.    As described herein, Plaintiff purchased the Unisom® SleepGels. The Unisom® SleepMinis and Unisom® PM Pain (collectively, the "Unpurchased Products") are substantially similar to the Purchased Product. All Products are manufactured, sold, marketed, advertised, labeled, and packaged by Defendants and sold under the same brand name, Unisom®.

58.    All Products contain the same active ingredient, diphenhydramine, and are marketed directly to consumers for personal use. All Products contain the same Challenged Representation, "Non-Habit Forming," conspicuously and prominently placed on the primary display panel of the front label and/or packaging, and Defendants buttress the Challenged Representation through a pervasive and consistent brand strategy effectuated through their marketing campaign to identify the Products as being "Non-Habit Forming." All Products are packaged in similar packaging, with the phrase "Non-Habit Forming" appearing on the front label in prominent, bold type font. The misleading effect of the Challenged Representation on consumers is the same for all Products: consumers pay for non-habit-forming products but receive Products that can cause habitual use.

**E.    Lack of Adequate Remedy at Law**

59.    Plaintiff and members of the Class are entitled to equitable relief as no adequate remedy at law exists.

19

60.   Injunctive relief is appropriate on behalf of Plaintiff and members of the Class because Defendants continue to misrepresent the Products with the Challenged Representation. Injunctive relief is necessary to prevent Defendants from continuing to engage in the unfair, fraudulent, and/or unlawful conduct described herein and to prevent future harm—none of which can be achieved through available legal remedies (such as monetary damages to compensate past harm). Further, injunctive relief, in the form of affirmative disclosures, is necessary to dispel the public misperception about the Products that has resulted from years of Defendants' unfair, fraudulent, and unlawful marketing efforts. Such disclosures would include, but are not limited to, publicly disseminated statements that the Products' Challenged Representation is not true and which provide accurate information about the Products' true nature; and/or requiring prominent qualifications and/or disclaimers on the Products' front label concerning the Products' true nature.  An injunction requiring affirmative disclosures to dispel the public's misperception and prevent the ongoing deception and repeat purchases based thereon is also not available through a legal remedy (such as monetary damages).

61.   Further, because a "public injunction" is available under the UCL, damages will not adequately "benefit the general public" in a manner equivalent to an injunction.

## VII.   CLASS ACTION ALLEGATIONS

62.   Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of herself and all others similarly situated, and as a member of the Classes defined as follows:

**Nationwide Class:**

All residents of the United States who, within the applicable statute of limitations periods, purchased the Products containing the Challenged Representation on the Products' labels or packaging for purposes other than resale ("**Nationwide Class**"); and

**California Subclass:**
All residents of California who, within four years prior to the filing of this Complaint, purchased the Products containing the Challenged Representation on the Products' labels or packaging for purposes other than resale ("**California Subclass**").

20
CLASS ACTION COMPLAINT

63. Excluded from the Class are: (i) Defendants, their assigns, successors, and legal representatives; (ii) any entities in which Defendants have controlling interests; (iii) federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and (iv) any judicial officer presiding over this matter and person within the third degree of consanguinity to such judicial officer.

64. Plaintiff reserves the right to amend or otherwise alter the class definition presented to the Court at the appropriate time in response to facts learned through discovery, legal arguments advanced by Defendants, or otherwise.

65. **Numerosity:** Members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, the Nationwide Class consists of tens of thousands of purchasers (if not more) dispersed throughout the United States, and the California Subclass likewise consists of thousands of purchasers (if not more) dispersed throughout the state of California. Accordingly, it would be impracticable to join all members of the Class before the Court.

66. **Common Questions Predominate:** There are numerous and substantial questions of law or fact common to all members of the Class that predominate over any individual issues. Included within the common questions of law or fact are:

a) Whether Defendants engaged in unlawful, unfair or deceptive business practices by advertising and selling the Products;

b) Whether Defendants' conduct of advertising and selling the Products as "Non-Habit Forming" when they contain habit-forming ingredients constitutes an unfair method of competition, or unfair or deceptive act or practice, in violation of Civil Code section 1750, et seq.;

c) Whether Defendants used the deceptive representation in connection with the sale of the Products in violation of Civil Code section 1750, et seq.;

d) Whether Defendants represented that the Products have characteristics or quantities that they do not have in violation of Civil Code section 1750, et seq.;

e) Whether Defendants advertised the Products with intent not to sell them as advertised in violation of Civil Code section 1750, et seq.;

f) Whether Defendants' labeling and advertising of the Products are untrue or misleading in violation of Business and Professions Code section 17500, et seq.;

g)    Whether Defendants knew or by the exercise of reasonable care should have known its labeling and advertising was and is untrue or misleading in violation of Business and Professions Code section 17500, et seq.;

h)    Whether Defendants' conduct is an unfair business practice within the meaning of Business and Professions Code section 17200, et seq.;

i)    Whether Defendants' conduct is a fraudulent business practice within the meaning of Business and Professions Code section 17200, et seq.;

j)    Whether Defendants' conduct is an unlawful business practice within the meaning of Business and Professions Code section 17200, et seq.;

k)    Whether Plaintiff and the Class paid more money for the Products than they actually received;

l)    How much more money Plaintiff and the Class paid for the Products than they actually received;

m)    Whether Defendants' conduct constitutes breach of express warranty;

n)    Whether Defendants' conduct constitutes breach of implied warranty;

o)    Whether Plaintiff and the Class are entitled to injunctive relief; and

p)    Whether Defendants was unjustly enriched by their unlawful conduct.

67.    **Typicality:** Plaintiff's claims are typical of the claims of the Class Members she seeks to represent because Plaintiff, like the Class Members, also purchased Defendants' misleading and deceptive Products. Defendants' unlawful, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced. Plaintiff and the Class sustained similar injuries arising out of Defendants' conduct. Plaintiff's and Class Members' claims arise from the same practices and course of conduct and are based on the same legal theories.

68.    **Adequacy:** Plaintiff is an adequate representative of the Class she seeks to represent because her interests do not conflict with the interests of the Class Members Plaintiff seeks to represent. Plaintiff will fairly and adequately protect Class Members' interests and has retained counsel experienced and competent in the prosecution of complex class actions, including litigating complex questions that arise in consumer protection and class action cases.

69.    **Superiority:** A class action is superior to all other available means of fairly and efficiently adjudicating the claims brought by Plaintiff and the Class. Common questions of law and

22

CLASS ACTION COMPLAINT

fact predominate here, as each Class Member's claims arise from the same course of conduct by Defendants and require resolution of the same legal and factual issues. The injury each individual Class Member has suffered is small when compared to the burden and expense of individually prosecuting the complex and extensive litigation Defendants' conduct necessitates. It would be impossible for Class Members on an individual basis to effectively redress the wrongs done to them. Even if Class Members could afford such individual litigation, the courts cannot. Absent class-wide relief, Class Members will continue to suffer harm while Defendants continue to profit from their unlawful conduct without consequence or remedy. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and to the court system, particularly where the subject matter of the case may be technically complex. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.

70.     **Injunctive/Equitable Relief**. The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

### VIII.   CAUSES OF ACTION

### COUNT ONE

### FRAUD BY MISREPRESENTATION

**(Brought by Plaintiff on behalf of the Nationwide Class, or Alternatively, the California Subclass)**

71.     Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

72.     Plaintiff brings this claim against Defendants on behalf of herself and on behalf of the Nationwide Class under California law, or alternatively, the California Subclass.

73.     Defendants affirmatively misrepresented the capabilities, quality, and nature of the Products when selling and marketing them.

23

CLASS ACTION COMPLAINT

74. Defendants also knew that their misrepresentations regarding the Products were material, and that a reasonable consumer would rely upon Defendants' representations in making purchasing decisions.

75. Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true nature of the Products.

76. Plaintiff and Class Members would have been reasonable in relying on Defendants' misrepresentations in making their purchasing decisions.

77. Plaintiff and Class Members had a right to rely upon Defendants' representations as Defendants maintained monopolistic control over knowledge of the true quality of the Products.

78. Plaintiff and Class Members sustained damages as a result of their reliance on Defendants' misrepresentations, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

## COUNT TWO

## UNJUST ENRICHMENT

**(Brought by Plaintiff on Behalf of the Nationwide Class, or Alternatively, the California Subclass)**

79. Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

80. Plaintiff brings this claim against Defendants on behalf of herself and on behalf of the Nationwide Class under California law, or alternatively, the California Subclass.

81. By purchasing the Products, Plaintiff and members of the Class conferred a benefit on Defendants in the form of the purchase price of the Products.

82. Defendants had knowledge of such benefit and Defendants appreciated the benefit because, were consumers not to purchase the Products, Defendants would not generate revenue from the sales of the Products.

83. Defendants' knowing acceptance and retention of the benefit is inequitable and unjust because the benefit was obtained by Defendants' fraudulent, misleading, and deceptive representations and omissions.

24

CLASS ACTION COMPLAINT

84.     As a direct and proximate result of Defendants' unjust enrichment, Plaintiff and members of the Class were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiff and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiff seeks a monetary award for unjust enrichment in damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiff and the Class for said monies, as well as injunctive relief to enjoin Defendants' misconduct to prevent ongoing and future harm that will result.

## COUNT THREE

### VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW

### (Cal. Bus. & Prof. Code, §§ 17200, et seq.)

### (Brought by Plaintiff on Behalf of the California Subclass)

85.     Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

86.     Plaintiff brings this cause of action against Defendants on behalf of herself and the California Subclass.

87.     This cause of action is brought pursuant to Business and Professions Code section 17200, *et seq.,* on behalf of Plaintiff and a California Subclass who purchased the Products.

88.     California Business & Professions Code sections 17200, *et seq.* (the "UCL") prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."

89.     Defendants, in their advertising and packaging of the Products, made false and misleading statements and fraudulent omissions regarding the quality and characteristics of the Products—specifically, the "Non-Habit Forming" representation—despite the fact the Products promote habitual use as part of consumers' nightly routine because of the inclusion of diphenhydramine in the Products. Such claims and omissions appear on the label and packaging of the Products, which are sold at retail stores and point-of-purchase displays.

25

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

90. Defendants do not have any reasonable basis for the claims about the Products made in Defendants' advertising and on Defendants' packaging or labeling because the Products can result in habitual use, contrary to the Challenged Representation. Defendants knew, and still know, that the Products do not conform to the Challenged Representation, though Defendants intentionally advertised and marketed the Products to deceive reasonable consumers into believing that they are "Non-Habit Forming."

91. Defendants' labeling and advertising of the Products led to, and continues to lead to, reasonable consumers, including Plaintiff, believing that the Products do not and cannot cause habitual use.

92. Plaintiff and the California Subclass have suffered an injury in fact and have lost money as a result of and in reliance upon Defendants' Challenged Representation—namely Plaintiff and the California Subclass lost the purchase price for the Products they bought from the Defendants.

93. Defendants' conduct, as alleged herein, constitutes unfair, unlawful, and fraudulent business practices pursuant to the UCL. The UCL prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising." Cal. Bus & Prof. Code, § 17200. In addition, Defendants' use of various forms of advertising media to advertise, call attention to, or give publicity to the sale of goods or merchandise that are not as represented in any manner constitutes unfair competition, unfair, deceptive, untrue or misleading advertising, and an unlawful business practice within the meaning of Business and Professions Code sections 17200 and 17531, which advertisements have deceived and are likely to deceive the consuming public, in violation of Business and Professions Code section 17200.

94. Defendants failed to avail themselves of reasonably available, lawful alternatives to further their legitimate business interests.

95. All of the conduct alleged herein occurred and continues to occur in Defendants' business. Defendants' wrongful conduct is part of a pattern, practice and/or generalized course of conduct, which will continue on a daily basis until Defendants voluntarily alter their conduct or

CLASS ACTION COMPLAINT

Defendants are otherwise ordered to do so.

96.     Pursuant to Business and Professions Code sections 17203 and 17535, Plaintiff and the members of the California Subclass seek an order from this Court enjoining Defendants from continuing to engage, use, or employ their practice of labeling and advertising the sale and use of the Products. Likewise, Plaintiff and the members of the California Subclass seek an order requiring Defendants to disclose such misrepresentation, and to preclude Defendants' failure to disclose the existence and significance of said misrepresentation.

97.     As a direct and proximate result of Defendants' misconduct in violation of the UCL, Plaintiff and members of the California Subclass were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiff and members of the California Subclass have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiff seeks a monetary award for violation of the UCL in restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiff and the California Subclass for said monies, as well as injunctive relief to enjoin Defendants' misconduct to prevent ongoing and future harm that will result.

### *"Unfair" Prong*

98.     Under the UCL, a challenged activity is "unfair" when "any injury it causes outweighs any benefits provided to consumers and the injury is one that the consumers themselves could not reasonably avoid." *Camacho v. Auto Club of Southern California*, 142 Cal.App.4th 1394, 1403 (2006).

99.     Defendants' action of mislabeling the Products with the Challenged Representation does not confer any benefit to consumers; rather, doing so causes injuries to consumers, who do not receive products commensurate with their reasonable expectations, overpay for the Products, and receive Products of lesser standards than what they reasonably expected to receive. Consumers cannot avoid any of the injuries caused by Defendants' deceptive labeling and advertising of the Products. Accordingly, the injuries caused by Defendants' deceptive labeling and advertising outweigh any benefits.

CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

100.   Some courts conduct a balancing test to decide if a challenged activity amounts to unfair conduct under California Business and Professions Code section 17200. They "weigh the utility of the Defendants' conduct against the gravity of the harm to the alleged victim." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012).

101.   Here, Defendants' conduct of labeling the Products with the Challenged Representation when, in reality, the Products promote habitual use in consumers' nightly routine has no utility and financially harms purchasers. Thus, the utility of Defendants' conduct is vastly outweighed by the gravity of harm.

102.   Some courts require that "unfairness must be tethered to some legislative declared policy or proof of some actual or threatened impact on competition." *Lozano v. AT&T Wireless Servs. Inc.*, 504 F. 3d 718, 735 (9th Cir. 2007).

103.   Defendants' labeling and advertising of the Products, as alleged herein, is false, deceptive, misleading, and unreasonable, and constitutes unfair conduct. Defendants knew or should have known of their unfair conduct. Defendants' misrepresentation constitutes an unfair business practice within the meaning of California Business and Professions Code section 17200.

104.   There existed reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein. Defendants could have refrained from labeling the Products with the Challenged Representation.

105.   All of the conduct alleged herein occurs and continues to occur in Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

106.   Pursuant to Business and Professions Code sections 17203, Plaintiff and the California Subclass seek an order from this Court enjoining Defendants from continuing to engage, use, or employ their practices of labeling the Products with the Challenged Representation.

107.   Plaintiff and the California Subclass have suffered injury in fact and have lost money as a result of Defendants' unfair conduct. Plaintiff and the California Subclass paid an unwarranted premium for these Products. Specifically, Plaintiff and the California Subclass paid for Products that were truly "non-habit forming." Plaintiff and the California Subclass would not have purchased

CLASS ACTION COMPLAINT

the Products, or would have paid substantially less for the Products, if they had known that the Products' advertising and labeling were deceptive. Accordingly, Plaintiff seeks restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

### *"Fraudulent" Prong*

108. The UCL considers conduct fraudulent (and prohibits said conduct) if it is likely to deceive members of the public. *Bank of the West v. Super. Court*, 2 Cal.4th 1254, 1267 (1992).

109. Defendants used the Challenged Representation with the intent to sell the Products to consumers, including Plaintiff and the California Subclass. The Challenged Representation is false, and Defendants knew or should have known of its falsity. The Challenged Representation is likely to deceive consumers into purchasing the Products because they are material to the average, ordinary, and reasonable consumer.

110. As alleged herein, the misrepresentation by Defendants constitutes a fraudulent business practice in violation of California Business & Professions Code section 17200.

111. Plaintiff and the California Subclass reasonably and detrimentally relied on the material and false Challenged Representation to their detriment in that they purchased the Products.

112. Defendants had reasonably available alternatives to further their legitimate business interests, other than the conduct described herein. Defendants could have refrained from labeling the Products with the Challenged Representation.

113. All of the conduct alleged herein occurs and continues to occur in Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct.

114. Pursuant to Business and Professions Code sections 17203, Plaintiff and the California Subclass seek an order of this Court enjoining Defendants from continuing to engage, use, or employ their practice of labeling the Products with the Challenged Representation.

115. Plaintiff and the California Subclass have suffered injury in fact and have lost money as a result of Defendants' fraudulent and unfair conduct. Plaintiff paid an unwarranted premium for the Products. Specifically, Plaintiff and the California Subclass paid for products that they believed do not and cannot cause habitual use, when, in fact, the Products promote and can result in habit formation. Plaintiff and the California Subclass would not have purchased the Products, or would

CLASS ACTION COMPLAINT

have paid substantially less for the Products, if they had known the truth about Defendants' misleading and deceptive advertising and labeling scheme. Accordingly, Plaintiff seeks restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

### *"Unlawful" Prong*

116. The UCL identifies violations of other laws as "unlawful practices that the unfair competition law makes independently actionable." *Velazquez v. GMAC Mortg. Corp.*, 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008).

117. Defendants' labeling of the Products, as alleged herein, violates California Civil Code sections 1750, *et seq.* (the "CLRA") and California Business and Professions Code sections 17500, *et seq.* (the "FAL") as set forth below in the sections regarding those causes of action.

118. Defendants' conduct in making the false representation described herein constitutes a knowing failure to adopt policies in accordance with and/or adherence to applicable laws, as set forth herein, all of which are binding upon and burdensome to their competitors. This conduct engenders an unfair competitive advantage for Defendants, thereby constituting an unfair, fraudulent and/or unlawful business practice under California Business & Professions Code sections 17200-17208. Additionally, Defendants' misrepresentation of material facts, as set forth herein, violates California Civil Code sections 1572, 1573, 1709, 1710, 1711, and 1770, as well as the common law.

119. Defendants' packaging, labeling, and advertising of the Products, as alleged herein, are false, deceptive, misleading, and unreasonable, and constitute unlawful conduct. Defendants knew or should have known of their unlawful conduct.

120. Defendants had reasonably available alternatives to further their legitimate business interests, other than the conduct described herein. Defendants could have refrained from labeling the Products with the Challenged Representation.

121. All of the conduct alleged herein occurs and continues to occur in Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct.

122. Pursuant to Business and Professions Code section 17203, Plaintiff and the California Subclass seek an order of this Court enjoining Defendants from continuing to engage, use, or employ

30

CLASS ACTION COMPLAINT

their practice of false and deceptive advertising of the Products.

123. Plaintiff and the California Subclass have suffered injury in fact and have lost money as a result of Defendants' unlawful conduct. Plaintiff and the California Subclass paid an unwarranted premium for the Products. Specifically, Plaintiff and the California Subclass paid for Products that were supposedly "non-habit-forming" despite the fact that diphenhydramine, an ingredient used in the Products, leads to habitual use by unwitting consumers. Plaintiff and the subclass would not have purchased the Products if they had known that Defendants' purposely deceived consumers into believing that the Products truly conform to the Challenged Representation. Accordingly, Plaintiff seeks restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

## COUNT FOUR

### VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW

### (Cal. Bus. & Prof. Code, §§ 17500, et seq.)

### (Brought by Plaintiff on Behalf of the California Subclass)

124. Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

125. Plaintiff brings this cause of action against Defendants on behalf of herself and the California Subclass.

126. The False Advertising Law, codified at Cal. Bus. & Prof. Code, §§ 17500, *et seq.,* prohibits "unfair, deceptive, untrue or misleading advertising[.]"

127. Defendants violated section 17500 when they advertised and marketed the Products through the unfair, deceptive, untrue, and misleading Challenged Representation disseminated to the public through the Products' labeling, packaging, and advertising. This representation was false because the Products do not conform to it. The representation was material because it is likely to mislead a reasonable consumer into purchasing the Products.

128. In making and disseminating the representation alleged herein, Defendants knew or should have known that the representation was untrue or misleading, and acted in violation of section 17500.

31

129. Defendants' Challenged Representation was specifically designed to induce reasonable consumers, like Plaintiff and the California Subclass, to purchase the Products.

130. As a direct and proximate result of Defendants' misconduct in violation of the FAL, Plaintiff and members of the California Subclass were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiff and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiff seeks a monetary award for violation of the FAL in restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiff and the California Subclass for said monies, as well as injunctive relief to enjoin Defendants' misconduct to prevent ongoing and future harm that will result.

## COUNT FIVE

### VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT

### (Cal. Civ. Code, §§ 1750, et seq.)

### (Brought by Plaintiff on Behalf of the California Subclass)

131. Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

132. Plaintiff brings this cause of action against Defendants on behalf of herself and the California Subclass.

133. The CLRA provides that "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful."

134. The Products are "goods," as defined by the CLRA in California Civil Code section 1761, subdivision (a).

135. Defendants are "persons," as defined by the CLRA in California Civil Code section 1761, subdivision (c).

136. Plaintiff and members of the California Subclass are "consumers," as defined by the CLRA in California Civil Code section 1761, subdivision (d).

CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

137. The purchase of the Products by Plaintiff and members of the California Subclass are "transactions" as defined by the CLRA under California Civil Code section 1761, subdivision (e).

138. Defendants violated the following sections of the CLRA by selling the Products to Plaintiff and the California Subclass through the false, misleading, deceptive, and fraudulent Challenged Representation:

      a.    Section 1770(a)(5) by representing that the Products have "characteristics, . . . uses [or] benefits . . . which they do not have."

      b.    Section 1770(a)(7) by representing that the Products "are of a particular standard, quality, or grade . . . when they are of another."

      c.    Section 1770(a)(9) by advertising the Products "with [the] intent not to sell [] as advertised."

139. Defendants' uniform and material representations and omissions regarding the Products were likely to deceive, and Defendants knew or should have known that their representations and omissions were untrue and misleading.

140. Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally misled and withheld material information from consumers, including Plaintiff, to increase the sale of the Products.

141. Plaintiff and members of the California Subclass could not have reasonably avoided such injury. Plaintiff and members of the California Subclass were unaware of the existence of the facts that Defendants suppressed and failed to disclose, and Plaintiff and members of the California Subclass would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

142. Plaintiff and the California Subclass suffered harm as a result of Defendants' violations of the CLRA because they relied on the Challenged Representation in deciding to purchase the Products. The Challenged Representation was a substantial factor. The Challenged Representation was material because a reasonable consumer would consider it important in deciding whether to purchase the Products.

143. By a letter dated July 17, 2025, Plaintiff advised Defendants of their false and

CLASS ACTION COMPLAINT

misleading representations and omissions pursuant to California Civil Code Section 1782(a), via U.S. certified mail, return receipt requested. The notices of Defendants' violations and demand for remedial action, as of the filing of this complaint, did not result in adequate correction, repair, replacement, and/or other remedy by Defendants, including all remedial action set forth in the letter and as set forth under section 1782, subdivision (c).

144. As a direct and proximate result of Defendants' misconduct in violation of the CLRA, Plaintiff and members of the California Subclass were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiff and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiff seeks a monetary award for violation of this Act in the form of damages, restitution, disgorgement of ill-gotten gains to compensate Plaintiff and the California Subclass for said monies.

145. Given that Defendants' conduct violated California Civil Code section 1780, Plaintiff and members of the California Subclass are entitled to seek, and do hereby seek, injunctive relief to put an end to Defendants' violations of the CLRA. Plaintiff and the California Subclass have no adequate remedy at law. Without equitable relief, Defendants' unfair and deceptive practices will continue to harm Plaintiff and the California Subclass.

146. Defendants' unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct warranting an award of punitive damages as permitted by law. Defendants' misconduct is malicious as Defendants acted with the intent to cause Plaintiff and consumers to pay for Products that they were not, in fact, receiving. Defendants willfully and knowingly disregarded the rights of Plaintiff and consumers as Defendants were, at all times, aware of the probable dangerous consequences of their conduct and deliberately failed to avoid misleading consumers, including Plaintiff. Defendants' misconduct is oppressive as, at all relevant times, said conduct was so vile, base, and/or contemptible that reasonable people would look down upon it and/or otherwise would despise such corporate misconduct. Said misconduct subjected Plaintiff and consumers to cruel and unjust hardship in knowing disregard of their rights.

34

CLASS ACTION COMPLAINT

Defendants' misconduct is fraudulent as Defendants, at all relevant times, intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiff and consumers. The wrongful conduct constituting malice, oppression, and/or fraud was committed, authorized, adopted, approved, and/or ratified by officers, directors, and/or managing agents of Defendants. Accordingly, Plaintiff seeks an award of punitive damages against Defendants.

## COUNT SIX

### BREACH OF EXPRESS WARRANTY

### (Cal. Comm. Code, § 2313)

### (Brought by Plaintiff on Behalf of the California Subclass)

147. Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

148. Plaintiff brings this cause of action against Defendants on behalf of herself and the California Subclass.

149. Defendants manufactured, marketed, advertised, labeled, distributed, and sold the Products to Plaintiff and members of the California Subclass.

150. In connection with the sale of the Products, Defendants made express warranties to Plaintiff and members of the California Subclass by affirmations of fact and promises relating to the Products that became part of the basis of the bargain. Specifically, Defendants expressly warranted that the Products are "Non-Habit Forming" through the following: (a) The prominent placement of the "Non-Habit Forming" representation on the primary display panel of the Products' front labels and/or packaging; (b) Consistent and repeated representations across the Products' labeling, packaging, and advertising that the Products are "Non-Habit Forming"; and (c) A pervasive marketing campaign and brand strategy, including but not limited to the Unisom® website and social media accounts, designed to identify and distinguish the Products as "Non-Habit Forming" sleep aids.

151. The "Non-Habit Forming" representation constitutes an affirmation of fact regarding a specific, material attribute of the Products, not mere puffery or opinion. The representation conveys to reasonable consumers that the Products do not and cannot cause habitual use, meaning

35

CLASS ACTION COMPLAINT

the Products do not pose a risk of frequent, routine use over prolonged periods.

152. The "Non-Habit Forming" representation became part of the basis of the bargain for Plaintiff and members of the California Subclass. Consumers seeking sleep-aid products specifically prefer and desire products that do not cause habitual use.

153. Plaintiff and members of the California Subclass relied on Defendants' express warranty in deciding to purchase the Products. The "Non-Habit Forming" representation appeared uniformly on every unit of the Products sold to Plaintiff and the California Subclass, and Defendants' marketing campaign reinforced the representation at every consumer touchpoint. Plaintiff and members of the California Subclass would not have purchased the Products, or would not have paid the prices they paid, absent Defendants' express warranty that the Products are "Non-Habit Forming."

154. Defendants breached the express warranty because the Products are, in fact, habit-forming. The Products contain diphenhydramine as their active ingredient, which is inherently habit-forming when used regularly.

155. Defendants were provided notice of their breach of express warranties prior to Plaintiff initiating this action. On or about July 17, 2025, Plaintiff's counsel, acting on behalf of all members of the California Subclass, mailed a Demand Letter, via U.S. certified mail, return receipt requested, to Defendant Chattem, Inc. at its headquarters and principal place of business (55 Corporate Drive, Bridgewater, NJ 08807) and its registered agent for service of process (CSC – Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Ste. 150N, Sacramento, CA 95833), which were delivered to those addresses on July 21, 2025 and July 24, 2025, respectively. Plaintiff's counsel also mailed the Demand Letter to Defendant Sanofi-Aventis U.S. LLC at its headquarters and principal place of business (55 Corporate Drive, Bridgewater, NJ 08807) and its registered agent for service of process (Belinda Darke, Registered U.S. Agent, 55 Corporate Drive, Bridgewater, NJ 08807), which were delivered to those addresses on July 22, 2025. Defendants were further on notice of the breach through publicly available scientific literature and studies demonstrating that diphenhydramine is habit-forming, reports and data from the National Poison Data System documenting increasing rates of diphenhydramine misuse, and the filing of this action.

CLASS ACTION COMPLAINT

156. As a direct and proximate result of Defendants' breach of express warranty, Plaintiff and members of the Class have suffered damages. Plaintiff and members of the Class did not receive the benefit of the bargain because they paid for Products expressly warranted as "Non-Habit Forming" but received Products that pose a significant risk of habitual use. Plaintiff and members of the Class overpaid for the Products based on Defendants' false express warranty and are entitled to the difference between the value of the Products as warranted and the actual value of the Products as delivered, together with incidental and consequential damages as permitted under California Commercial Code §§ 2714 and 2715.

157. Plaintiff and members of the Class are further entitled to all other relief permitted by law, including but not limited to costs of suit.

## COUNT SEVEN

### SONG-BEVERLY ACT – BREACH OF IMPLIED WARRANTY

### (Cal. Civ. Code §§ 1792, 1791.1, et seq)

### (Brought by Plaintiff on Behalf of the California Subclass)

158. Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

159. Plaintiff brings this cause of action against Defendants on behalf of herself and the California Subclass.

160. Plaintiff and the other California Subclass members who purchased the Products in California are "buyers" within the meaning of California Civil Code § 1791(b).

161. The Products are "consumer goods" within the meaning of California Civil Code § 1791(a).

162. Defendants are "manufacturers" of the Products within the meaning of California Civil Code § 1791(j).

163. Defendants impliedly warranted to Plaintiff and the other California Subclass members that the Products were "merchantable" within the meaning of California Civil Code §§ 1791.1(a) & 1792; however, the Products do not have the quality that a buyer would reasonably expect.

CLASS ACTION COMPLAINT

164. California Civil Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1) Pass without objection in the trade under the contract description.

(2) Are fit for the ordinary purposes for which such goods are used.

(3) Are adequately contained, packaged, and labeled.

(4) Conform to the promises or affirmations of fact made on the container or label.

165. The Products would not pass without objection in the trade because the Products contain diphenhydramine, an active ingredient that poses a risk of habitual use, rendering the Products unfit for their advertised purpose of providing non-habit-forming sleep assistance. Further, the Products are not adequately labeled because the "Non-Habit Forming" representation on the Products' packaging is false and misleading, and the Products do not conform to that affirmation of fact made on the container or label.

166. Defendants provided Plaintiff and the California Subclass members with an implied warranty that the Products, and any components thereof, are merchantable and fit for the ordinary purposes for which they were sold. The Products, however, are not fit for their ordinary purpose because, inter alia, the Products contain diphenhydramine, which is inherently habit-forming when used regularly, and which poses a risk of tolerance, dependence, and habitual misuse, contrary to the representations made on the Products' labels and packaging.

167. Defendants impliedly warranted that the Products were of merchantable quality and fit for such use. This implied warranty included, inter alia, the following: (i) a warranty that the Products manufactured, marketed, distributed, and/or sold by Defendants were suitable for use as a non-habit forming sleep aid; and (ii) a warranty that the Products would be fit for their intended use, providing non-habit-forming sleep assistance, as represented on the Products' labels and throughout Defendants' marketing campaign.

168. Contrary to the applicable implied warranties, the Products were not fit for their ordinary and intended purpose. Instead, the Products are defective and fail to conform to the promises and affirmations made on the Products' labels and packaging, including, but not limited

CLASS ACTION COMPLAINT

to, the false "Non-Habit Forming" representation, because the Products' active ingredient, diphenhydramine, poses a significant risk of habitual use, tolerance development, and dependence.

169.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and the California Subclass members received goods whose condition substantially impairs their value to Plaintiff and the California Subclass members. Plaintiff and the California Subclass members have been damaged as a result of overpaying for the Products, which were sold at a premium based on the false "Non-Habit Forming" representation, and which do not deliver the non-habit-forming attributes for which Plaintiff and the California Subclass members bargained.

170.    Pursuant to California Civil Code §§ 1791.1(d) and 1794, Plaintiff and the other California Subclass members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Products, or the overpayment or diminution in value of their Products.

171.    Pursuant to Cal. Civ. Code § 1794, Plaintiff and the other California Subclass members are entitled to attorneys' fees and costs.

172.    Defendants' actions, as complained of herein, breached the implied warranty that the Products were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

## IX. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, prays for judgment against Defendants as follows:

    a.    **Certification:** For an order certifying this action as a class action, appointing Plaintiff as the Class Representative, and appointing Plaintiff's Counsel as Class Counsel;

    b.    **Declaratory Relief:** For an order declaring that Defendants' conduct violates the statutes and laws referenced herein consistent with applicable law and pursuant to only those causes of action so permitted;

    c.    **Injunction:** For an order requiring Defendants to alter its their business

CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

practices to prevent or mitigate the risk of the consumer deception and violations of law outlined herein. This includes, for example, orders that Defendants immediately cease and desist from making the Challenged Representation in violation of law; that enjoin Defendants from continuing to market, advertise, distribute, and sell the Products in the unlawful manner described herein; that require Defendants to engage in an affirmative advertising campaign to dispel the public misperception of the Products resulting from Defendants' unlawful conduct; and/or that require Defendants to take all further and just corrective action, consistent with applicable law and pursuant to only those causes of action so permitted;

d.    **Damages/Restitution/Disgorgement:** For an order awarding monetary compensation in the form of damages, restitution, and/or disgorgement to Plaintiff and the Class requested herein, consistent with applicable law and pursuant to only those causes of action so permitted;

e.    **Punitive Damages/Penalties:** For an order awarding punitive damages, statutory penalties, and/or monetary fines, consistent with applicable law and pursuant to only those causes of action so permitted;

f.    **Attorneys' Fees & Costs:** For an order awarding attorneys' fees and costs, consistent with applicable law and pursuant to only those causes of action so permitted;

g.    **Pre/Post-Judgment Interest:** For an order awarding pre-judgment and post-judgment interest, consistent with applicable law and pursuant to only those causes of action so permitted; and

h.    **All Just & Proper Relief:** For such other and further relief as the Court deems just and proper.

///

CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues and causes of action so triable.


DATED: June 5, 2026                                    Respectfully submitted,

                                                       **CLARKSON LAW FIRM, P.C.**


                                                        */s/ Yana Hart*
                                                       Yana Hart, Esq.
                                                       Cassandra Rasmussen, Esq.
                                                       22525 Pacific Coast Highway
                                                       Malibu, CA 90265
                                                       Tel: (213) 788-4050

41
CLASS ACTION COMPLAINT